UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| TARA LEWIS, Individually And On Behalf Of All Others Similarly Situated, | ) ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | CLASS ACTION |
| | ) | |
| v. | ) ) | COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| | ) | |
| JIANGBO PHARMACEUTICALS, INC.; LINXIAN JIN; ELSA SUNG; ZILING SUN; and WUBO CAO, | ) ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) ) | |
| | ) | |

Plaintiff Tara Lewis ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation.

## SUMMARY OF THE ACTION

1.      This is a federal class action on behalf of purchasers of Jiangbo Pharmaceuticals, Inc. ("Jiangbo" or the "Company") securities between June 8, 2010, and May 31, 2011, inclusive (the "Class Period"), seeking damages for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Jiangbo is engaged in the research, development, production, marketing and sales of pharmaceutical products in China. The Company's operations are located in Eastern China in an Economic Development Zone in Laiyang City, Shandong Province. Jiangbo produces both western and Chinese herbal-based medical drugs in tablet, capsule, granule, syrup and electuary

(sticky syrup) form.

3.      In October 2007 Jiangbo became publicly-traded through a reverse merger, and initially traded over-the-counter.  On June 8, 2010, the Company's shares began trading on the NASDAQ Global Market ("NASDAQ").

4.      Less than a year later, however, on May 31, 2011, NASDAQ halted trading of Jiangbo stock after a series of revelations indicating serious financial misconduct at the Company.

5.      In March 2011, the Company's Chief Financial Officer ("CFO") resigned.

6.      The next month, on April 4, 2011, the Company reported that it had replaced its auditor.

7.      On May 27, 2011, the Company filed an amendment to its quarterly report on Form 10-Q – filed just four days earlier – disclosing for the first time that the Securities and Exchange Commission ("SEC") had commenced an informal investigation and requested documents from Jiangbo in December 2010, and that the Company had initiated its own parallel internal investigation in February 2011.

8.      Following this announcement, on May 31, 2011, NASDAQ halted trading of Jiangbo stock.

9.      On June 7, 2010, the Company filed a Form 8-K announcing the resignation of the independent members of the Audit Committee (the "Audit Committee") of the Company's Board of Directors (the "Board").  The Form 8-K attached a 23-page letter from the Audit Committee, detailing the Company's refusal to cooperate with the Audit Committee's investigation.  According to the Audit Committee, the Company's Chief Executive Officer ("CEO") Linxian Jin ("Jin") and Chairman of the Board Wubo Cao ("Cao") refused to provide

materials to the Audit Committee's forensic accountants and counsel.

10.     Moreover, the Audit Committee also concluded that "the manner and timing of the Company's payment to the Audit Committee's advisers ([Cadwalader Wickersham & Taft LLP] and [Ernst & Young (China) Advisory Limited]) raise additional serious concerns regarding the veracity or correctness of banking information provided by the Company and regarding the Company's ability and willingness to pay for necessary costs related to the internal investigation."

11.     Specifically, despite reporting more than $147 million in cash and equivalents as of March 31, 2011, the Company missed scheduled payments to the Audit Committee's counsel and accountants.  When the payments were belatedly made, they were from the personal account of a Jiangbo employee.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

13.     This Court has jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. § 1331.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act; and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District.  At all relevant times, Jiangbo's stock traded on the NASDAQ exchange.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of a national securities trading platform.

## PARTIES

### Plaintiff

16.    Plaintiff Tara Lewis, as set forth in the accompanying certification, purchased Jiangbo common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and misleading statements and/or material omissions alleged herein.

### Jiangbo

17.    Defendant Jiangbo is incorporated in Florida and headquartered in Laiyang City, Yantai, Shandong Province, China.

### Individual Defendants

18.    Defendant Jin has served as CEO since July 1, 2010, immediately following the Company's listing on the NASDAQ.

19.    Defendant Elsa Sung ("Sung") was the Jiangbo's CFO from 2007 until her resignation effective March 31, 2011. Sung is a licensed CPA in the State of Georgia and a member of the American Institute of Certified Public Accountants.

20.    Defendant Ziling Sun ("Sun") has served as interim CFO since May 12, 2011, following the resignation of prior CFO Sung. Since January 2010, Sun has been an accountant at Laiyang Jiangbo Pharmaceuticals, Co., Ltd., a limited liability company organized under the laws of People's Republic of China and controlled by the Company through contractual arrangements.

21.    Defendant Cao was a founder of the Company and has served as the chairman of

the Board since October 2007 and all relevant times. Cao previously served as CEO of the Company from October 2007 until June 30, 2010, just following the beginning of its public trading.

22.     Defendants Jin, Sung, Sun, and Cao are collectively referred to herein as the "Individual Defendants."   During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Jiangbo, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Jiangbo, as discussed in detail below. Because of their positions with Jiangbo, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

23.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Jiangbo's business.

24.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

25.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Jiangbo's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Jiangbo's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Jiangbo's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Jiangbo's business, operations and management and the intrinsic value of Jiangbo's common stock; and (ii) caused Plaintiff and members of the Class to purchase Jiangbo common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Defendants' Materially False and Misleading
### Statements During the Class Period

27.     On September 28, 2010, Jiangbo filed an annual report on Form 10-K with the

SEC, signed by Jin, Sung and Board members Cao, Feng Xiaowei, Huang Lei, Ge Jian, and John

Wang, which reported net revenues for fiscal 2010 (ended June 30, 2010) of $97.4 million and

net income of $29.8 million. The Company reported cash of $108.6 million.   The Form 10-K

stated, in pertinent part:

> During the year ended June 30, 2010, we had revenues from sales of $97.4
> million as compared to revenues from sales of $117.4 million for the year ended
> June 30, 2009, a decrease of $19.9 million or approximately 17.0%. During the
> year ended June 30, 2010, we did not have any revenues from sales to related
> parties as compared to revenues from sales to related parties of $0.2 million for
> the year ended June 30, 2009.
>                     *       *       *
> Although several of our major products have entered into their maturity, we
> believe we will be able to continue to maintain our sales at its current level. In
> September 2010, we have commercially launched our newly approved product
> Felodipine Sustained Release Tablets and we expect the product to be quickly
> accepted by the market. Additionally, we expect to have our Hongrui facility
> renovation work fully completed and GMP certified by October 2010 and
> relaunched several of the traditional Chinese medicines acquired from Hongrui.

28.     The Form 10-K, signed by Jin, also stated, in relevant part, the following:

**LIQUIDITY AND CAPITAL RESOURCES**

We have historically financed our operations and capital expenditures principally
through private placements of debt and equity offerings, bank loans, and cash
provided by operations. We did not have significant financing activities in fiscal
year 2010 and 2009. In fiscal year 2008, our primary financing activities included
the following:

- In November 2007, we raised $5,000,000 in gross proceeds
  through the sale of convertible notes (the "2007 Notes"). We
  received $4,645,592 in net proceeds after deducting
  placement agent discounts and commissions and payment of
  professional and other related expenses. Further detailed
  discussion regarding this financing is provided in the

footnotes to financial statements.

- In May 2008, we raised $30,000,000 in gross proceeds through the sale of convertible notes (the "2008 Notes"). We received $28,313,500 in net proceeds after deducting placement agent discounts and commissions and payment of professional and other related expenses. Further detailed discussion regarding this financing is provided in the footnotes to financial statements.

\*       \*       \*

***Cash Flows***

<u>2010 Compared to 2009</u>

As of June 30, 2010, the company has cash and cash equivalents of approximately $108.6 million, which represents 53.6% of total assets as compared to approximately $104.4 million in the same period for fiscal 2009, which represented 61.8% of the total assets, an increase of $4.3 million.

Net cash flow provided by operating activities was $20.3 million in fiscal 2010, compared with $62.9 million in fiscal 2009, a decrease of $42.7 million. The 2010 cash provided by operating activities was primarily due to the followings: 1) decrease in our inventories amount of $1.1 million 2) increase in accrued liabilities of $4.2 million 3) increase in other payables of $1.7 million 4) add-back of depreciation and amortization expenses of $2.4 million 5) add-back of amortization of debt issuance costs and amortization of debt discount of $15.6 million partially offset by the gain in change of fair value of derivative liabilities of $14.6 million, increase in accounts receivable of $14.5 million, decrease of accounts payable of $2.1 million, and decrease in taxes payable of $5.0 million.

Net cash flow used in investing activities was $16.6 million in fiscal 2010 and $8.3 million in fiscal 2009, an $8.3 million increase. The primarily uses of cash flow for investing activities in 2010 was a purchase of a land use right of $17.0 million and partially offset by the proceeds from sales of investments of $0.5 million.

Net cash flow provided by financing activities was $0 in fiscal 2010 and while net cash flow provided by financing activities was $1.4 million in fiscal 2009. The decrease of net cash flow provided by financing activities was mainly due to the increase in change in restricted cash and partially offset by the net proceeds from notes payable.

We reported a net increase in cash for the year ended June 30, 2010 of $4.3 million as compared to a net increase in cash of $56.2 million for the year ended June 30, 2009.

Our working capital position decreased by $11.3 million to $88.5 million at June 30, 2010 from $99.8 million at June 30, 2009. This decrease in working capital is primarily attributable to the reclassification of convertible debt of $12.2 million from long term liabilities to short term liabilities, additional derivative liabilities associated with the convertible debentures of $18.5 million, increase in accrued liabilities of $3.5 million, increase in notes payable of $3.8 million, increase in other payable of $1.7 million and decrease in inventories of $1.1 million in fiscal year 2010 and partially offset by the increase in accounts receivable of $14.0 million, increase in cash of $4.3 million, increase in restricted cash of $3.8 million, decrease in accounts payable of $2.0 million, decrease in liabilities assumed from reorganization of $1 million and decrease in taxes payable of $5.0 million.

29.     The Form 10-K the Company significantly noted with respect to its disclosure controls and procedures, in part:

> Our management is not aware of any material weaknesses in our internal control over financial reporting, and nothing has come to the attention of management that causes them to believe that any material inaccuracies or errors exist in our financial statements as of June 30, 2010. The reportable conditions and other areas of our internal control over financial reporting identified by us as needing improvement have not resulted in a material restatement of our financial statements. Nor are we aware of any instance where such reportable conditions or other identified areas of weakness have resulted in a material misstatement or omission in any report we have filed with or submitted to the Commission.

30.     In exhibits to the Form 10-K, Jin and Sung also certified that the information in the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that, based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

31.     The statements in paragraphs 27 to 30 were materially false and misleading because:

         (a)     The Company's cash balances were materially overstated;

- 9 -

(b)   The Company's internal controls over financial reporting were inadequate, rendering the Company's reported finances lacking in any reasonable basis; and

(c)   The certifications signed by Jin and Sung were untrue because the financial statements did not fairly present the financial condition of the Company or its operating results.

32.   On September 30, 2010, the Company announced its fiscal 2010 and fourth quarter results in a press release and Form 8-K signed by CFO Sung, which stated in pertinent part:

> Total revenue decreased 5.9% year-over-year to $29.3 million from $31.2 million. The Company carried five drugs during the quarter ended June 30, 2010, with Clarithromycin sustained release tablets accounting for 43.0% of total sales, Itopride Hydrochloride granules 24.4%, Baobaole chewable tablets 16.7%, and Radix Isatidis dispersible tablets 15.7% during the quarter. The year-over-year decrease in fiscal fourth quarter 2010 revenues reflects a 30.5% decline in sales of Baobaole chewable tablets, partly offset by sales increases of Clarithromycin sustained release tablets and Radix Isatidis dispersible tablets by 21.9% and 45.1%, respectively.
>
> Gross profit decreased 8.2% to $21.1 million, from $23.0 million in the comparable period of fiscal year 2009. Gross margin decreased to 72.0% from 73.8% in the year ago quarter, mainly reflecting higher raw material costs for TCM herbs due to natural disasters in Southern China during the second half of fiscal year 2010. During the fourth quarter of fiscal year 2010, TCM accounted for about 20% of total cost of sales.
>
> *     *     *
>
> Total revenue for fiscal year 2010 decreased 17.0% to $97.4 million from $117.4 million in fiscal year 2009. Gross profit decreased 20.3% to $71.3 million, as compared to $89.5 million in the prior year. Gross margin was 73.2%, compared to 76.2% last year, primarily due to reduced per unit sales prices as part of the Company's effort to restructure its distribution and sales system in January 2009 and, to a lesser extent, due to higher TCM herb raw material costs during second half of fiscal year 2010. Operating income decreased 3.1% to $48.2 million from $49.8 million in fiscal year 2009. Operating margin increased to 49.5% from 42.4% in the prior year, mainly reflecting significantly reduced commission to the Company's sales representatives after the distribution restructuring. Net income increased 3.4% to $29.9 million, as compared to $28.9 million in fiscal year 2009. Net margin as percentage of revenue expanded 6.0 percentage points to 30.6% from 24.6% in the comparable period. Fully diluted earnings per share were $1.36, compared to $0.09 in fiscal year 2009.
>
> *     *     *

As of June 30, 2010, the Company had $108.6 million in cash, as compared to $104.4 million at the end of fiscal year 2009. Working capital was $88.5 million, down from $99.8 million as of June 30, 2009. Shareholders' equity was $134.5 million, as compared to $126.1 million at the end of fiscal year 2009.

The Company generated $20.3 million in cash flow from operating activities in fiscal year 2010.  Net cash flow used in investing activities was $16.6 million in fiscal year 2010, which was primarily used to purchase land use rights of approximately $17.0 million, partially offset by proceeds of approximately $0.5 million from the sale of investments.

*    *    *

"We believe that our strong balance sheet and cash position provides Jiangbo with unique flexibility to acquire innovative new products and pursue strategic acquisitions. Presently we are evaluating select opportunities to enhance our growth prospects, strengthen our market position and vertically integrate our operations. With the transitional year of 2010 behind us, we believe that we are well positioned to create value for shareholders in 2011 and beyond," commented Mr. Jin.

33.    The statements in paragraph 32 were materially false and misleading because:

(a)    The Company's cash balances were materially overstated; and

(b)    The Company's internal controls over financial reporting were inadequate, rendering the Company's reported finances lacking in any reasonable basis.

34.    On November 15, 2010, Jiangbo filed a Form 10-Q with the SEC, signed by Jin and Sung, which stated the following about the Company's cash and liquidity, in part:

The Company maintains cash deposits in financial institutions that exceed the amounts insured by the U.S. government. Balances at financial institutions or state-owned banks within the PRC are not covered by insurance. Non-performance by these institutions could expose the Company to losses for amounts in excess of insured balances. As of September 30, 2010 and June 30, 2010, the Company's bank balances, including restricted cash balances, exceeded government-insured limits by approximately $137,990,000 and $119,675,000, respectively. To date, the Company has not experienced any losses in such accounts.

*    *    *

**LIQUIDITY AND CAPITAL RESOURCES**

Net cash provided by operating activities for the three months ended September 30, 2010 was $13.6 million as compared to net cash provided by operating activities of $17.9 million for the three months ended September 30, 2009. The cash provided by operating activities for the three months ended September 30,

- 11 -

2010 was mainly attributed to the following: 1) net income of $10.6 million 2) decrease in accounts receivable of $2.4million, 3) an add-back of amortization on debt discount and deferred debt costs of $7.0 million, and 4) increase in accounts payable and accrued liabilities of $1.6 million, partially offset by the gain from change in fair value of derivative liabilities of $7.5 million.

Net cash used in investing activities for the three months ended September 30, 2010, was mainly attributable to purchases and prepayments of equipments.

There was no net cash used in financing activities for the three months ended September, 30, 2010 and 2009.

We reported a net increase in cash for the three months ended September 30, 2010 of $15.3 million as compared to a net increase in cash of $18.5 million for the three months ended September 30, 2009.

We have historically financed our operations and capital expenditures principally through private placements of debt and equity offerings, bank loans, and cash provided by operations. At September 30, 2010, almost all of our liquid assets were held in RMB denominations deposited in banks within the PRC. The PRC has strict rules for converting RMB to other currencies and for movement of funds from the PRC to other countries. Consequently, in the future, we may face difficulties in moving funds deposited within the PRC to fund working capital requirements in the U.S. The Company's management is currently evaluating the situation. Our working capital position increased by $22.6 million to $111.1 million at September 30, 2010, from $88.5 million at June 30, 2010. This increase in working capital is primarily attributable to an increase in cash of $15.3 million, decrease in derivative liabilities of $9.6 million, and partially offset by decrease in net accounts receivable of $1.8 million.

We anticipate that our working capital requirements may increase as a result of our anticipated business expansion plan necessitated by continued increase in sales, potential increases in the price of our raw materials, competition and our relationships with suppliers or customers. We believe that our existing cash, cash equivalents and cash flows from operations will be sufficient to meet our present anticipated future cash needs for at least the next 12 months. We may, however, require additional cash resources due to changed business conditions or other future developments, including any investments or acquisitions we may decide to pursue.

  35.  The November 15, 2010, Form 10-Q also stated the following regarding the

Company's internal controls and procedures, in part:

  As of the end of the Company's quarter ended September 30, 2010 covered by this report, the Company carried out an evaluation, with the participation of the Company's management, including the Company's Chief Executive Officer and

Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures pursuant to Rule 13a-15(e) and 15d-15(e) of the Exchange Act.  Based on that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of September 30, 2010, due to the significant deficiencies that we identified in internal control over financial reporting in our annual report on Form 10-K for the fiscal year ended June 30, 2010 (the "Form 10-K").

**Remediation Measures of Significant Deficiencies**

We have implemented, or plan to implement, the measures described below under the supervision and guidance of our management to remediate the control deficiencies identified in the Form 10-K and to strengthen our internal controls over financial reporting. Key elements of the remediation effort include, but are not limited to, the following initiatives, which have been implemented, or are in the process of implementation, as of the date of filing of this interim report:

1. We have started training our internal accounting staff on US GAAP and financial reporting requirements. Additionally, we are also taking steps to hire additional senior US GAAP financial reporting personnel to ensure we have adequate resources to meet the requirements of segregation of duties.

2. We have involved both internal accounting and operations personnel and a reputable outside independent consultants with US GAAP technical accounting expertise in the evaluation process and providing remediation plans for our internal controls a complex, non-routine transaction to obtain additional guidance as to the application of generally accepted accounting principles to such a proposed transaction. As of June 30, 2010, the internal control consultants have completed initial evaluation and provide remediation plans to our senior management. We are currently in the process of modifying and implementing new policies and procedures within the financial reporting process.

3. We have continued to evaluate the internal audit function in relation to the Company's financial resources and requirements. We have established an internal audit department and the department have started evaluating the Company's current internal control over financial reporting process.  To the extent possible, we will provide necessary trainings to our internal audit staff and implement procedures to assure that the initiation of transactions, the custody of assets and the recording of transactions will be performed by separate individuals.

We believe that the foregoing steps will remediate the significant deficiencies identified above, and we will continue to monitor the effectiveness of these steps and make any changes that our management deems appropriate to insure that the foregoing do not become material weaknesses. We plan to fully implement the above remediation plan by December 31, 2010.

\*     \*     \*

Our management is not aware of any material weaknesses in our internal control over financial reporting, and nothing has come to the attention of management that causes them to believe that any material inaccuracies or errors exist in our financial statements as of September 30, 2010. The reportable conditions and other areas of our internal control over financial reporting identified by us as needing improvement have not resulted in a material restatement of our financial statements. Nor are we aware of any instance where such reportable conditions or other identified areas of weakness have resulted in a material misstatement or omission in any report we have filed with or submitted to the Commission.

(b)    *Changes in internal controls over financial reporting.* During the three months covered by this quarterly report, there was no change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

36.      In exhibits to the Form 10-Q, Jin and Sung also certified that the information in the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that, based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

37.      The statements in paragraphs 34 to 36 were materially false and misleading because:

         (a)      The Company's cash balances were materially overstated;

         (b)      The Company's internal controls over financial reporting were inadequate, rendering the Company's reported finances lacking in any reasonable basis; and

      (c)     The certifications signed by Jin and Sung were untrue because the financial statements did not fairly present the financial condition of the Company or its operating results.

38.     On November 16, 2010, Jiangbo issued a press release, and Form 8-K signed by Sung, announcing the positive results for the quarter ended September 30, 2010, which included, in pertinent part:

First Quarter Fiscal Year 2011 Highlights:

- Revenues increased 13.5% year-over-year to $27.7 million

- Gross profit was $20.0 million, up 10.4% from the comparable period in fiscal 2010

- Operating income increased 14.8% year-over-year to $14.6 million

- Net income increased 436.3% to $10.6 million, or $0.29 per fully diluted share

- Non-GAAP adjusted net income was $10.1 million, or $0.67 per fully diluted share, for the three months ended September 30, 2010, up 14.0% from non-GAAP adjusted net income of $8.9 million, or $0.60 per fully diluted share, for the quarter ended September 30, 2009

- Jiangbo started the production and sale of Felodipine sustained release tablets

- Cash and equivalents as of September 30, 2010 totaled $123.9 million

"We are pleased with this quarter's year-over-year revenue growth, which was driven by increased sales of our top three products, Clarithromycin, Itopride Hydrochloride, and Radix Isatidis dispersible tablets," said Mr. Linxian Jin, Jiangbo's Chief Executive Officer. "We also are excited about the early performance of our Felodipine sustained release tablets, which we officially launched during the first quarter. We believe that this new drug, along with the anticipated production of several traditional Chinese medicines at our Hongrui facility, will begin to contribute meaningfully to revenue as we head into 2011."

39.     The statements in paragraph 38 were materially false and misleading because:

      (a)     The Company's cash balances were materially overstated;

      (b)     The Company's internal controls over financial reporting were inadequate, rendering the Company's reported finances lacking in any reasonable basis.

40.   Beginning on or about December 22, 2010, unknown to the public, the SEC had begun an informal investigation of Jiangbo.

41.   In February 2011, the Company began its own internal investigation relating to the SEC's investigation.

42.   On February 14, 2011, the Company disclosed it was unable to timely file its Form 10-Q for the quarter ended December 31, 2010.  Defendants filed the Form 10-Q with the SEC on February 22, 2011, signed by Jin and Sung.  The Form 10-Q stated the following regarding its cash and liquidity, in pertinent part:

> The Company maintains cash deposits in financial institutions that exceed the amounts insured by the U.S. government. Balances at financial institutions or state-owned banks within the PRC are not covered by insurance. Non-performance by these institutions could expose the Company to losses for amounts in excess of insured balances. As of December 31, 2010 and June 30, 2010, the Company's bank balances, including restricted cash balances, exceeded government-insured limits by approximately $148,220,000 and $119,675,000, respectively. To date, the Company has not experienced any losses in such accounts.
>
> *      *      *
>
> **LIQUIDITY AND CAPITAL RESOURCES**
>
> Net cash provided by operating activities for the six months ended December 31, 2010 was $26.1 million as compared to net cash provided by operating activities of $3.2 million for the six months ended December 31, 2009. The cash provided by operating activities for the six months ended December 31, 2010 was mainly attributed to the following: 1) net income of $21.7 million, 2) a decrease in accounts receivable of $8.3 million, 3) an add-back of amortization on debt discount and deferred debt costs of $9.8 million, and 4) accrued liabilities of $1.4 million, partially offset by an increase in inventories of $1.0 million, a decrease in other payable of $1.2 million, a decrease in tax payable of $1.4 million and the gain from change in fair value of derivative liabilities of $12.3 million.
>
> Net cash used in investing activities for the six months ended December 31, 2010 was $0.2 million and mainly attributable to purchases and prepayments of equipments. Net cash used by investing activities for the six months ended December 31, 2009 was $16.5 million and was mainly attributable to purchase of a land use right for future factory expansion of $17 million.

- 16 -

Net cash used in financing activities for the six months ended December 31, 2010 was $2.2 million. Net cash used in financing activities was $2.2 million for the six months ended December 31, 2009. The net cash used in financing activities was primarily attributable to repayment of bank loans.

We reported a net increase in cash for the six months ended December 31, 2010 of $27.3 million as compared to a net decrease in cash for the six months ended December 31, 2009 of $15.4 million.

We have historically financed our operations and capital expenditures principally through private placements of debt and equity offerings, bank loans, and cash provided by operations. At December 31, 2010, almost all of our liquid assets were held in RMB denominations deposited in banks within the PRC. The PRC has strict rules for converting RMB to other currencies and for movement of funds from the PRC to other countries. Consequently, in the future, we may face difficulties in moving funds deposited within the PRC to fund working capital requirements in the U.S. The Company's management is currently evaluating the situation. Our working capital position increased by $37.5 million to $126.0 million at December 31, 2010, from $88.5 million at June 30, 2010. This increase in working capital is primarily attributable to an increase in cash of $27.3 million, decrease in derivative liabilities of $14.5 million, and partially offset by decrease in net accounts receivable of $7.0 million.

We anticipate that our working capital requirements may increase as a result of our anticipated business expansion plan necessitated by continued increase in sales, potential increases in the price of our raw materials, competition and our relationships with suppliers or customers. We believe that our existing cash, cash equivalents and cash flows from operations will be sufficient to meet our present anticipated future cash needs for at least the next 12 months. We may, however, require additional cash resources due to changed business conditions or other future developments, including any investments or acquisitions we may decide to pursue.

     43.     The February 22, 2011 Form 10-Q also stated the following about the Company's financial results for the quarter ended December 31, 2010, in part:

REVENUE . During the six months ended December 31, 2010, we had revenues of $51.1 million as compared to revenues of $42.6 million for the six months ended December 31, 2009, an increase of $8.5 million or approximately 20.03%. For the three months ended December 31, 2010, we had revenues of $23.4 million as compared to revenues of $18.2 million for the three months ended December 31, 2009, an increase of $5.2 million or 28.83%. The overall increase in total revenue in the first six months of fiscal year 2011 was primarily due to the increase of sales of our three top selling products. Clarithromycin Sustained-released Tablets, Itopride Hydrochloride granules and Radix Isatidis Disperable Tablets, and partially offset by the decrease in the revenue generated from

Baobaole chewable tablets. The three top selling products accounted for approximately 82.5% of our total revenue for the six months ended December 31, 2010. The newly launched Felodipine Sustained-released tablets also contributed to the sales increase.

*      *      *

Gross profit was $36.8 million for the six months ended December 31, 2010, as compared to $31.6 million for the six months ended December 31, 2009, and $16.8 million for the three months ended December 31, 2010, as compared to $13.5 million for the three months ended December 31, 2009, representing gross margins of approximately 72.10% and 74.33% for the six months ended December 31, 2010 and 2009, and 71.82% and 74.33% for the three months ended December 31, 2010 and 2009, respectively. The decrease in the gross profit for the period ended December 31, 2010 was primarily due to increase in raw material prices, particularly related to Clarithromycin Sustained-released Tablets and Radix Isatidis Disperable Tablets, and more products with lower gross margin were sold in the western pharmaceutical medicines category.

44.     The Form 10-Q also again noted the following about the Company's disclosure controls and procedures:

As of the end of the Company's second quarter ended December 31, 2010 covered by this report, the Company carried out an evaluation, with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures pursuant to Rule 13a-15(e) and 15d-15(e) of the Exchange Act. Based on that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of December 31, 2010, due to the significant deficiencies that we identified in internal control over financial reporting in our annual report on Form 10-K for the fiscal year ended June 30, 2010 (the "Form 10-K").

**Remediation Measures of Significant Deficiencies**

We have implemented, or plan to implement, the measures described below under the supervision and guidance of our management to remediate the control deficiencies identified in the Form 10-K and to strengthen our internal controls over financial reporting.

*      *      *

We believe that the foregoing steps will remediate the significant deficiencies identified above, and we will continue to monitor the effectiveness of these steps and make any changes that our management deems appropriate to insure that the foregoing do not become material weaknesses. We plan to fully implement the above remediation plan by June 30, 2011. . . .

*      *      *

Our management is not aware of any material weaknesses in our internal control over financial reporting, and nothing has come to the attention of management

- 18 -

that causes them to believe that any material inaccuracies or errors exist in our financial statements as of December 31, 2010. The reportable conditions and other areas of our internal control over financial reporting identified by us as needing improvement have not resulted in a material restatement of our financial statements. Nor are we aware of any instance where such reportable conditions or other identified areas of weakness have resulted in a material misstatement or omission in any report we have filed with or submitted to the Commission.

(b)    *Changes in internal controls over financial reporting.* During the six months covered by this quarterly report, there was no change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

45.    Also, despite the Company's repeated assurances that it was taking measures to remedy its internal controls issues, problems persisted and the deadlines continued to be extended.

46.    Again in exhibits to the Form 10-Q, Jin and Sung certified that the information in the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that, based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

47.    The statements in paragraphs 42 to 44, and 46 were materially false and misleading because:

(a)    The Company's cash balances were materially overstated;

(b)    The Company's internal controls over financial reporting were inadequate, rendering the Company's reported finances lacking in any reasonable basis; and

(c)    The certifications signed by Jin and Sung were untrue because the financial statements did not fairly present the financial condition of the Company or its operating results.

48.    On February 23, 2011, Jiangbo issued a press release, and Form 8-K signed by

Sung on February 28, 2011, touting the results for the second fiscal quarter 2011, in pertinent part:

**Second Quarter Fiscal Year 2011 Highlights**

- Revenue increased 28.8% to $23.4 million from $18.2 million in the corresponding quarter ended December 31, 2009

- Gross profit grew 24.5% to $16.8 million from $13.5 million in the corresponding quarter ended December 31, 2009

- Operating income climbed 81.5% to $13.0 million from $7.1 million in the corresponding quarter ended December 31, 2009

- Net income was $11.1 million, or $0.87 per basic share, for the quarter ended December 31, 2010, compared to $5.3 million, or $0.49 per basic share in the quarter ended December 31, 2009

- Excluding non-cash gains related to the change in fair value of derivative liabilities of $4.9 million, amortization of debt discount and debt issuance costs related to convertible debentures of $2.8 million, and unrealized loss on investments of $0.02 million, non-GAAP adjusted net income for diluted EPS was $5.5 million, or $0.37 per fully diluted share for the three months ended December 31, 2010, compared to non-GAAP adjusted net loss for diluted EPS of $16.8 million, or a loss of $1.11 per fully diluted share for the quarter ended December 31, 2009. *

"We are pleased to report another quarter of strong year-over-year revenue growth, driven by increased sales of Clarithromycin sustained-release tablets, Radix Isatidis dispersible tablets and Baobaole chewable tablets, and incremental revenue from our new line of Felodipine sustained-release tablets," said Jiangbo's CEO, Mr. Linxian Jin. "Our year-over-year comparisons for this quarter benefitted from an extra six weeks of production versus the same period last year, when we temporarily closed our main facility to complete Good Manufacture Practice ("GMP") recertification. In the second quarter of fiscal year 2011, we continued to generate robust cash flow from operations and we ended the period with over $135.0 million in cash and cash equivalents."

49.   The statements in paragraph 48 were materially false and misleading because:

  (a)   The Company's cash balances were materially overstated; and

  (b)   The Company's internal controls over financial reporting were inadequate, rendering the Company's reported finances lacking in any reasonable basis.

50.     On March 18, 2011, Jiangbo filed a Form 8-K with the SEC announcing the resignation of CFO Sung effective March 31, 2011.

51.     On March 26, 2011, unknown to shareholders, the SEC issued a subpoena to the Company and began a non-public formal investigation.

52.     On April 4, 2011, the Company filed a Form 8-K, signed by Jin, with the SEC announcing that on March 30, 2011, it "engaged Bernstein & Pinchuk LLP as its principal accountant to replace Frazer Frost, LLP, who advised the Company that it did not intend to stand for re-appointment as the Company's principal accountant for its next fiscal year." Subsequently on April 19, 2011, after Bernstein & Pinchuck LLP merged with Marcum BP, Marcum BP became the Company's independent registered accounting firm.

53.     On or about April 19, 2011, problems began to arise and continued through the remainder of the Class Period from the delayed payments and lack of cooperation between the Company's management and Chairman Cao and the independent advisors hired to conduct Jiangbo's internal investigation relating to the SEC's formal investigation of the Company.

54.     Once again, on May 16, 2011, Jiangbo disclosed that it would be unable to timely file its Form 10-Q for the quarter ended March 31, 2011.

55.     Also on May 16, 2011, the Company announced that Ziling Sun would be appointed Interim CFO.

56.     On May 23, 2011, Jiangbo filed its late Form 10-Q for the quarter ended March 31, 2011, signed by Jin and Interim CFO Sun. The report included the following results, in part:

> REVENUE. During the nine months ended March 31, 2011, we had revenues of $69.2 million as compared to revenues of $68.1 million for the nine months ended March 31, 2010, an increase of $1.1 million or approximately 1.6%. For the three months ended March 31, 2011, we had revenues of $18.1 million as compared to revenues of $25.6 million for the three months ended March 31, 2010, a decrease of $7.5 million or 29.2%. The slight increase in total revenue in the nine months

period ended March 31, 2011 was primarily due to an 2.4% appreciation of the RMB against the US dollar and offset by an approximately 0.8% decrease in the revenue when measured in the operating company Laiyang Jiangbo's functional currency. We had a decrease in the sales of Itopride Hydrochloride granules and Baobaole Chewable Tables sales of our three top selling products and the sales decrease was offset by the increase in sales of Clarithromycin Sustained-released Tablets, Radix Isatidis Disperable Tablets and Ciprofloxacin Hydrochloride tablets. The newly launched Felodipine Sustained-released tablets also contributed to the sales increase.

For the three months ended March 31, 2011, we had revenues of $18.1 million which is consistent with the revenues of $25.6 million for the three months ended March 31, 2010, a decrease of $7.5 million or 29.2%.We had an average of 34% decrease in the decrease in the revenue generated from our top four products Clarithromycin Sustained-released tablets, Itopride Hydrochloride granules, Baobaole chewable tablets and Radix Isatidis granules. The revenue decrease was offset by the increase in Ciprofloxacin Hydrochloride tablets and Felodipline sustained release tablets. We were able to have manufacture capacities to meet our customers' special orders on Ciprofloxacin Hydrochloride tablets in the third quarter and the Felodipline sustained release tablets was newly launched in fiscal year 2011. The overall decrease in total revenue in the third quarter of fiscal year 2011 was primarily due to the increased sales in the third quarter of fiscal year 2010 as a result of the loss of production time caused by the Good Manufacture Practice ("GMP") re-certification procedure in the second quarter fiscal year 2010. Many of our customers were unable to receive shipments in the second quarter of fiscal year 2010; as our production resumed to the normal level in December 2010, customers placed more orders in the third quarter of fiscal year 2010 to make up for the shortage in the second quarter of fiscal year 2010. The GMP re-certification procedure generally is performed by the Chinese State Food and Drug Administration, or SFDA, every five years and it required the production process to be stopped for the production lines under inspection. The re-certification procedure lasted for approximately six weeks at our main facility in the second quarter of fiscal year 2010.

\*     \*     \*

Gross profit was $48.9 million for the nine months ended March 31, 2011, as compared to $50.2 million for the nine months ended March 31, 2010, and $12.0 million for the three months ended March 31, 2011, as compared to $18.6 million for the three months ended March 31, 2010, representing gross margins of approximately 70.6% and 73.7% for the nine months ended March 31, 2011 and 2010, and  66.5% and 72.7% for the three months ended March 31, 2011 and 2010, respectively. The decrease in the gross profit for the periods ended March 31, 2011 was primarily due to increase in raw material prices, particularly related to Clarithromycin Sustained-released Tablets and Radix Isatidis Disperable Tablets, and more products with lower gross margin were sold in the western pharmaceutical medicines category.

57.     The untimely Form 10-Q also stated the following regarding the Company's

liquidity and capital:

## LIQUIDITY AND CAPITAL RESOURCES

Net cash provided by operating activities for the nine months ended March 31, 2011 was $36.1 million as compared to net cash provided by operating activities of $8.5 million for the nine months ended March 31, 2010. The cash provided by operating activities for the nine months ended March 31, 2011 was mainly attributed to the following: 1) net income of $26.8 million, 2) a decrease in accounts receivable of $14.1 million, 3) an add-back of amortization on debt discount and deferred debt costs of $12.1 million, 4) an add-back of depreciation and amortization expenses of $2.8 million  and 5) accrued liabilities of $3.2 million, partially offset by a decrease in other payable of $3.1 million, a decrease in tax payable of $3.6 million and the gain from change in fair value of derivative liabilities of $15.0 million.

Net cash used in investing activities for the nine months ended March 31, 2011 was $0.1 million and mainly attributable to purchases of equipments and building improvements. Net cash used by investing activities for the nine months ended March 31, 2010 was $16.5 million and was mainly attributable to purchase of a land use right for future factory expansion of $17 million.

Net cash used in financing activities for the nine months ended March 31, 2011 was $2.3 million primarily due to payments for bank loans.

We reported a net increase in cash for the nine months ended March 31, 2011 of $38.3 million as compared to a net decrease in cash for the nine months ended March 31, 2010 of $7.8 million.

We have historically financed our operations and capital expenditures principally through private placements of debt and equity offerings, bank loans, and cash provided by operations. At March 31, 2011, almost all of our liquid assets were held in RMB denominations deposited in banks within the PRC. The PRC has strict rules for converting RMB to other currencies and for movement of funds from the PRC to other countries. Consequently, in the future, we may face difficulties in moving funds deposited within the PRC to fund working capital requirements in the U.S. The Company's management is currently evaluating the situation. Our working capital position increased by $51.0 million to $139.6 million at March 31, 2011, from $88.5 million at June 30, 2010. This increase in working capital is primarily attributable to an increase in cash of $38.3 million, decrease in short term bank loans of $2.2 million, decrease in accrued liabilities of $6.0 million, decrease in tax payable of $3.4 million and decrease in derivative liabilities of $17.3 million, and partially offset by decrease in net accounts receivable of $12.4 million and increase in net convertible notes of $3.3 million.

We anticipate that our working capital requirements may increase as a result of our anticipated business expansion plan necessitated by continued increase in sales, potential increases in the price of our raw materials, competition and our relationships with suppliers or customers. We believe that our existing cash, cash equivalents and cash flows from operations will be sufficient to meet our present anticipated future cash needs for at least the next 12 months. We may, however, require additional cash resources due to changed business conditions or other future developments, including any investments or acquisitions we may decide to pursue.

58.     The Form 10-Q also stated the following regarding Jiangbo's disclosure controls

and procedures:

As of the end of the Company's third quarter ended March 31, 2011 covered by this report, the Company carried out an evaluation, with the participation of the Company's management, including the Company's Chief Executive Officer and Interim Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures pursuant to Rule 13a-15(e) and 15d-15(e) of the Exchange Act. Based on that evaluation, the Company's Chief Executive Officer and Interim Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of March 31, 2011, due to the significant deficiencies that we identified in internal control over financial reporting in our annual report on Form 10-K for the fiscal year ended June 30, 2010 (the "Form 10-K").

**Remediation Measures of Significant Deficiencies**

We have implemented, or plan to implement, the measures described below under the supervision and guidance of our management to remediate the control deficiencies identified in the Form 10-K and to strengthen our internal controls over financial reporting.          *          *          *

Our management is not aware of any material weaknesses in our internal control over financial reporting, and nothing has come to the attention of management that causes them to believe that any material inaccuracies or errors exist in our financial statements as of March 31, 2011. The reportable conditions and other areas of our internal control over financial reporting identified by us as needing improvement have not resulted in a material restatement of our financial statements. Nor are we aware of any instance where such reportable conditions or other identified areas of weakness have resulted in a material misstatement or omission in any report we have filed with or submitted to the Commission

(b) *Changes in internal controls over financial reporting*. During the nine months covered by this quarterly report, there was no change in our internal control over

- 24 -

financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

59.     Notably absent in the May 23, 2011, Form 10-Q was a disclosure about the remedial measures to be taken by the Company regarding its internal control issues was a deadline for implementing these measures.

60.     Once again in Exhibits to the Form 10-Q, Jin and Sun certified that the information in the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that, based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

61.     The statements in paragraphs 56 to 58, and 60 were materially false and misleading because:

> (a)     The Company's cash balances were materially overstated;
>
> (b)     The Company's internal controls over financial reporting were inadequate, rendering the Company's reported finances lacking in any reasonable basis; and
>
> (c)     The certifications signed by Jin and Sun were untrue because the financial statements did not fairly present the financial condition of the Company or its operating results.

62.     Although undisclosed to the public until later, on May 23, 2011, Board and Audit Committee members Michael Marks ("Marks") and John Wang ("Wang"), who were conducting the Company's internal investigation in response to the SEC's information request and subsequent subpoena, had notified the Board that they did not intend to stand for re-election at the upcoming annual meeting scheduled for June 27, 2011.

63.     On May 27, 2011, the Company filed an amended Form 10-Q/A, signed by Jin and Sun, which disclosed for the first time that the SEC had been conducting an investigation and requesting documents of the Company.  It stated, in pertinent part:

> The Company received a letter of informal investigation dated December 22, 2010 from the U.S. Securities and Exchange Commission ("SEC") requesting the Company to provide certain documents. The letter indicated that the Company should not construe the investigation as an indication by the SEC or its staff that any violation of law has occurred or any adverse reflection on any person, entity or security.
>
> In February 2011, the Company, through its Audit Committee, commenced an internal investigation into certain transactions. On March 26, 2011, the staff of the SEC having been informed by the Company of its internal investigation, notified the Company that it had begun a non-public formal investigation and requested certain information and materials relating to certain aspects of the Company's public disclosures and operations. The SEC has advised the Company that its investigation is not intended to suggest that the SEC believes at this time that the Company has done anything wrong and is in fact a fact finding investigation. The Company is committed to cooperating with the SEC Investigation and has responded to the SEC's request for materials and information. In light of the SEC's investigation, the Company, through its Audit Committee, decided that the investigation should be conducted as an independent investigation and that the scope of the independent investigation should cover all issues raised by the SEC Investigation. To that end the Audit Committee retained an international, U.S.-based law firm and an international professional accounting firm to conduct a comprehensive review of the issues raised by the SEC Investigation. The SEC Investigation and the Independent Investigation are still in their early stages, and the Company cannot predict the duration or outcome of the investigations, or the impact, if any, those investigations may have on the Company's financial condition or results of operations.

64.     The statements in paragraph 63 were materially false and misleading because they did not disclose that Chairman Cao and the Company's management were not cooperating with the SEC or Company's independent investigation and were not properly nor promptly paying the Company's advisors from a Company account.

## The Truth Emerges

65.     On May 31, 2011, NASDAQ halted trading in the Company's stock, which last traded at $ 3.08.  The stock has never resumed trading making it presently worthless.

66.     On June 7, 2011, the Company filed a Form 8-K with the SEC disclosing that

Audit Committee members Marks and Wang had informed the Board in a letter dated June 6,

2011 of their immediate resignations.  An exhibit to the Form 8-K was a 23-page letter signed by

Marks and Wang, which detailed the reasons and timeline of events leading to their resignations.

Specifically, directors Marks and Wang stated that they could no longer fulfill their duties as

directors and Audit Committee members due to management's lack of support and cooperation

with their independent internal investigation.  The letter stated, in pertinent part:

> On behalf of the Audit Committee of the Board of Directors of Jiangbo
> Pharmaceuticals, Inc., I write to memorialize the following events and to inform
> you of the resignation of the independent members of the Audit Committee for
> reasons set forth below.
>
> As you are aware, the Audit Committee charter authorizes the Committee "to
> retain independent legal, accounting or other advisers as it determines necessary
> to carry out its duties and, if necessary, to institute special investigations."  The
> Company received a subpoena from the U.S. Securities and Exchange
> Commission ("SEC") on March 26, 2011.  In response, the Audit Committee
> exercised its authority, with the Board's informed consent, to undertake an
> independent internal investigation of certain issues raised by the SEC and to
> provide the findings of that investigation to the SEC.  The Audit Committee
> retained Cadwalader, Wickersham & Taft LLP ("Cadwalader"), a law firm that
> had done no prior work for the company, to conduct the independent investigation
> by, through, and at the exclusive direction of the Audit Committee.  Jointly with
> Cadwalader, the Audit Committee retained Ernst & Young (China) Advisory
> Limited ("E&Y") to provide forensic accounting services in connection with the
> internal investigation at the direction of Cadwalader.
>
> An independent investigation requires the complete and total cooperation from
> senior management.  Unfortunately, the Chairman of the Board of Directors of
> Jiangbo and members of his management team have exhibited repeatedly their
> unwillingness to cooperate in even the most basic requests from the investigation
> team, despite numerous and repeated explanations by the Audit Committee and
> Cadwalader to explain the importance of this investigation and the expectations of
> the SEC.
>
> As detailed below, the conduct and statements by the Company and those
> controlling and advising it have demonstrated a clear and continuing lack of
> cooperation over the past five weeks.  Moreover, the manner and timing of the
> Company's payments to the Audit Committee's advisers (Cadwalader and E&Y)
> raise additional serious concerns regarding the veracity or correctness of banking
> information provided by the Company, and regarding the Company's ability and
> willingness to pay for necessary costs related to the internal investigation.  As a
> result, the Audit Committee has determined that it can no longer effectively
> conduct an independent investigation as contemplated by the Audit Committee.

The independent internal investigation has been halted. Cadwalader and E&Y have withdrawn from their respective engagements with the consent of the Audit Committee, and the independent members of the Audit Committee have determined to resign, effective today, as will be communicated in separate resignation letters to the Board of Directors.

*       *       *

### Reasons for Resignation

The facts and circumstances described above reveal a situation in which it is not possible for us to fulfill our obligations as independent members of the Audit Committee, and have left us no choice but to tender our resignation. In particular, the following reasons have compelled this decision:

1. **Lack of Cooperation.** Over the past five weeks, the Company has revealed an overall and continuing lack of cooperation, evidenced most recently by the fact that the documents and information received from the Company to date still remain deficient in substantial respects. In light of this conduct, the Audit Committee, Cadwalader and E&Y have been unable to conduct a thorough, independent internal investigation. Despite numerous and lengthy meetings, phone calls, emails, and memoranda in which expert advisors explained the importance of the internal investigation and the Company's cooperation with it, and despite the warning of the potential serious ramifications of the Company's lack of cooperation, the situation has not improved in any material way. We can conclude that the Company, and in particular Mr. Cao, does not have the intention to cooperate with the internal investigation.[footnote 7]

2. **Manner and Timing of Payments to the Audit Committee's Advisors.** Although the Company has made certain invoice payments and retainer payments to Cadwalader and E&Y, the manner and timing of those payments have raised serious concerns regarding the Company's willingness and ability to pay for necessary investigative costs, and concerns about the veracity of banking information previously provided to Cadwalader and E&Y. In particular, the Company has previously provided documents indicating that it has a large cash balance at [redacted] representing approximately [redacted]% of the Company's cash balance as of December 31, 2010. Nevertheless, the Company has not paid Cadwalader and E&Y from its accounts at [redacted]. Rather, the Company has paid the Audit Committee's advisers from either a much smaller Company account at [redacted] or, more troubling, from a personal bank account apparently belonging to an individual employee of Jiangbo. The Company also had previously indicated that the Company does not use and does not have access to internet banking but the Company transferred funds to the Audit Committee's advisers via internet banking. Finally, although the Company pledged to timely pay an agreed-upon retainer to Cadwalader, the Company paid that retainer in piece meal and only days after it had indicated it would be paid in full. The Company explained to Cadwalader that the delay and partial payments were due to limitations placed on the Company's transfer of funds by the Company's banks. This explanation for the timing and manner of payments is either a troubling indication that the Company does not have free access to its cash balances, or a misleading excuse meant to hide the fact that the Company

is unwilling to timely and fully honor its obligations to the Audit Committee.

3.  **No Realistic Options for Corrective Action.**  The Audit Committee has carefully considered potential ways in which the Company might be able to remediate the current situation, but have concluded that any such steps would be ultimately insufficient to permit the internal investigation to continue.  Because we believe the primary source of the lack of cooperation is the Chairman, we have considered asking Mr. Cao to step down during the pendency of the internal investigation.  However, we are convinced such a measure would be futile.  First, we cannot unilaterally remove the Chairman for the pendency of the investigation, and understand that the Board would not act to remove Mr. Cao.  Second, it is unreasonable to believe that Mr. Cao would voluntarily step down as Chairman.  Third, even if Mr. Cao were to relinquish the chairman's position during the pendency of the internal investigation, the Audit Committee would fully expect, based on our experience and knowledge of the Company, that Mr. Cao would continue to exercise de facto control over the Company and the Board.  The recent and consistent history of the Company's lack of cooperation with respect to the internal investigation is therefore more than likely to continue, and has made it impossible for Cadwalader and E&Y to continue the internal investigation in a credible and appropriate manner.  Under such circumstances, the independent members of the Audit Committee can no longer serve the interests of shareholder by remaining on the Board.

Footnote 7: *To the extent any public disclosures imply that the Company is cooperating with the internal investigation, such statements are inaccurate.*

(Emphasis added).

67.  On August 1, 2011, the Company announced in a press release that it has received a letter dated July 26, 2011, from NASDAQ indicating that the Company's securities will no longer be listed on it.  The press release also stated, in part:

Nasdaq staff members have determined to delist the Company's securities based on: (1) public interest concerns under Nasdaq Listing Rule 5101 *regarding efforts of the Company and its Chairman to obstruct an independent internal investigation authorized by the Audit Committee and the failure to allow the Audit Committee to fulfill its responsibilities and duties*; (2) the Company's failure to comply with Listing Rule 5605(c)(3) and IM-5605-5 as well as the statutory responsibilities and authority of the Company's Audit Committee, set forth in Section 10A(m)(2) of the Securities Exchange Act of 1934; and (3) the Company's failure to comply with the Audit Committee composition requirements of Listing Rule 5605(c)(2)(A).

Unless the Nasdaq's determination is appealed, the Company expects that trading of its common stock will be suspended at the opening of business on August 4, 2011, and a Form 25-NSE will be filed with the Securities and Exchange

Commission (the "SEC"), which will remove the Company's securities from listing and registration on Nasdaq. The Company has decided to focus on addressing current issues facing the Company and its business and will not appeal Nasdaq's determination. The Company hopes, but does not guarantee, that its shares will be eligible for quotation over the counter market following delisting from Nasdaq. The Company's common stock will not be eligible for quotation on the over the counter market until at least one market maker agrees to file the appropriate application with Financial Industry Regulatory Authority ("FINRA") and such application is accepted by FINRA. Trading in the Company's stock has been halted by Nasdaq since May 31, 2011.

(Emphasis added).

68.    As of the time of the filing of this complaint, the Company has not resumed trading and no indication has been given by the Company's management or the Board that it will be taking concrete measures regarding the concerns raised in the June 6, 2011, letters from Marks and Wang.

## CLASS ACTION ALLEGATIONS

69.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Jiangbo's securities between June 8, 2010, and May 31, 2011, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

70.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Jiangbo's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Jiangbo shares were traded publicly

during the Class Period on the NASDAQ and as of September 24, 2010, Jiangbo had 12,639,302 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Jiangbo and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

71.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

72.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

73.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a. Whether the federal securities laws were violated by Defendants' acts as alleged herein;

      b. Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Jiangbo; and

      c. To what extent the members of the Class have sustained damages and the proper measure of damages.

74.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

75.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

76.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## LOSS CAUSATION

77.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

78.     During the Class Period, Plaintiff and the Class purchased Jiangbo securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

79.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Jiangbo, control over, and/or receipt and/or modification of Jiangbo's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Jiangbo, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

80.    The market for Jiangbo securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Jiangbo securities traded at artificially inflated prices during the Class Period. During the Class Period, on August 20, 2010, the Company's stock closed as high as $10.49 per share.

81.    Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Jiangbo securities and market information relating to Jiangbo, and have been damaged thereby.

82.    During the Class Period, the artificial inflation of Jiangbo stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Jiangbo's financial performance and prospects. These material misstatements and/or omissions created an unrealistically positive assessment of Jiangbo and its business, operations, and financial performance, thus causing the price of the Company's

securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

83.     At all relevant times, the market for Jiangbo securities was an efficient market for the following reasons, among others:

(a)     Jiangbo stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Jiangbo filed periodic public reports with the SEC and the NASDAQ;

(c)     Jiangbo regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Jiangbo was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

84.     As a result of the foregoing, the market for Jiangbo securities promptly digested current information regarding Jiangbo from all publicly available sources and reflected such information in Jiangbo's stock price. Under these circumstances, all purchasers of Jiangbo

securities during the Class Period suffered similar injury through their purchase of Jiangbo securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

85.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

86.    The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Jiangbo who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against Jiangbo and the Individual Defendants

87.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

88.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and

other members of the Class to purchase Jiangbo's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

89.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Jiangbo's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

90.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Jiangbo's financial well-being and prospects, as specified herein.

91.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Jiangbo's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Jiangbo and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's

securities during the Class Period.

92.     Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

93.     The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Jiangbo's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary

to discover whether those statements were false or misleading.

94.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Jiangbo securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Jiangbo securities during the Class Period at artificially high prices and were damaged thereby.

95.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the SEC investigation and accounting and financial problems of the Company, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Jiangbo securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

96.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

97.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of the Exchange Act
### <u>Against the Individual Defendants</u>

98.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

99.     The Individual Defendants acted as controlling persons of Jiangbo within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

101.     As set forth above, Jiangbo and the Individual Defendants each violated either Section 10(b) or Rule 10b-5, by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to

Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: Tampa, Florida
       August 2, 2011

/s/ Christopher S. Polaszek

Christopher S. Polaszek
(Fla. Bar No. 0116866)
Kristi Stahnke McGregor
**MILBERG LLP**
201 North Franklin St., Suite 3200
Tampa, Florida 3302
Telephone: (813) 367-5713
Facsimile: (561) 892-8164
E-mail: cpolaszek@milberg.com
           kmcgregor@milberg.com


Andrei V. Rado
Jessica J. Sleater
**MILBERG LLP**
One Pennsylvania Plaza, 49th Floor
New York, New York  10119
Telephone: (212) 594-5300
Facsimile:  (212) 868-1229
E-mail:  arado@milberg.com
           jsleater@milberg.com

**WOHL & FRUCHTER LLP**
Ethan D. Wohl
570 Lexington Avenue, 16th Floor
New York, New York  10022
Telephone: (212) 758-4000
Facsimile: (212) 758-4004

*Attorneys for Plaintiff and the Proposed Class*

## <u>CERTIFICATION OF PROPOSED LEAD PLAINTIFF</u>

I, Tara Lewis, hereby certify as follows:

1. I have reviewed the complaint against Jiangbo Pharmaceuticals, Inc. ("Jiangbo") and related parties and have authorized its filing.

2. I did not purchase Jiangbo securities at the direction of plaintiffs' counsel or in order to participate in any private action under the federal securities laws.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. The attached Schedule A lists all of my purchases and sales in Jiangbo securities during the class period specified in the complaint.

5. During the three year period preceding the date hereof, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

6. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except for reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of July, 2011.

_____
TARA LEWIS

**SCHEDULE A**

| Date | Transaction | Quantity | Share Price |
|------|-------------|----------|-------------|
| 1/5/2011 | Buy | 3,000 | $6.15 |
| 1/20/2011 | Sell | (3,000) | $6.50 |
| 1/25/2011 | Buy | 4,135 | $5.50 |
| 1/28/2011 | Sell | (4,135) | $5.52 |
| 2/7/2011 | Buy | 7,000 | $5.50 |
| 2/18/2011 | Sell | (7,000) | $5.90 |
| 3/22/2011 | Buy | 8,400 | $5.21 |
| 3/22/2011 | Buy | 6,000 | $5.50 |
| 3/22/2011 | Buy | 500 | $5.26 |
| 3/23/2011 | Buy | 500 | $5.01 |
| 5/10/2011 | Buy | 1,400 | $4.00 |